The next case for argument is 20-2011, Apple v. Wi-LAN. Mr. Davey, please proceed. May it please the Court. We have three topics to discuss this morning. A consistent use of a claim term and specification, direct infringement, and proper apportionment of damages, particularly after Omega. I'm happy to talk about those in any order. But I may as well start at the beginning. Claim construction. Why don't you go ahead and start with damages? I'm happy to start with damages. And as I just mentioned, the key principle of damages in this Court is proper apportionment. If you're going to look at other licenses that include a portfolio of patents, you have to figure out the value of the particular patents that you're trying to value. And that was just not done here. Actually, there's a good phrase, good facts make good law. This is a very stark example of an expert not trying to value the relevant invention. The incremental value of the invention. There's three aspects to look at. In our yellow brief at page 29, we quote the expert, Mr. Skiffin. The expert is Mr. Kennedy. I can get back to Mr. Skiffin in a second. I'm jumping ahead. The expert Kennedy said – no, the quote is from the expert Kennedy quoting what Mr. Skiffin told him. Mr. Skiffin told you that any subset of Weiland's portfolio gets a 25% discount, right? Any subset gets 25% discount, and the answer is yes. Which portion of the appendix are you reading from? 15336. So that is their expert saying that regardless of the value of the particular patent at issue here, the answer is 75% of the comparable patent. It's also at 15338. So we're talking about Bluetooth. What is the answer to the value of Bluetooth? Well, a single Bluetooth patent here would be 75%. So what, in your view, would have been sufficient in terms of the – to make these licenses comparable? For example, if the three licenses we're talking about, if they had called out the two patents that are in dispute here as being principal or whatever they do in licenses, less than enough, that would have been enough, right? It would have to value – it has to be an effort to assess the technological value of the patent. So if you're honored with a look at what that expert did and assess that was tried, then that would be enough. But that is not what happened in this case. I'm not talking about so much what the expert did. I'm talking about the licenses themselves and their compatibility. So if you had three other licenses with other people, how close would they have had to be to make them reliable in this circumstance? If each of those licenses had called out the 145 and the 757, good enough? In a patent portfolio of 1,000, the comparable license here gave those companies access to 1,000 patents. So in Omega, it was 40. So you have to somehow link the Panther issue here. But suppose – to follow up on – I see where you're going. But to follow up on Joe's first question, suppose the three licenses had all said the asserted patents, the 145 and the 757, and the rest of it is what I think Mr. Skippin called CHAP, and it's thrown in an extra 25%. Wouldn't that be good enough to bring those licenses into the realm of evidence that's acceptable on the question of evaluation? No, Your Honor, because – two points on that. You have to assess the value of the invention. Pointing to 1,000 other patents, 900 and 997 patents, doesn't help do that. It's giving value here. Okay, so let's further the hypothetical. What if they had witnesses or testimony with respect to each of those licenses, and the people negotiating said, well, yeah, we were forced to license the entire portfolio, but we're really after these two particular patents. That would be enough, right? It would be closer, but it depends why they are really after it. And we know the reason here, Your Honor, is because of litigation risk. Nothing to do with the technology of the patent. Under Section 284, under Garrison, the goal of this process, the apportionment process, is to capture what this inventor has given the public, the incremental value. Let's take away the conventional features. What did this person contribute? And if we're going to price that based on other patents, and there's 1,000 other licenses, and then there's 1,000 other patents granted by that license. Let me just do a couple of quick housekeeping things related to this. You didn't challenge the licenses themselves as admissible. No. The licenses are admissible. The licenses, yes. Right. Are admissible. These licenses are admissible. What you're challenging is can these claim that any two of the 1,000 could be worth 75%. Is that right? Yeah. Across the board. So this isn't a challenge to the license, because we've had many cases, genetics included, where we've allowed in licenses, even though they're not to the patented issue. And in this case, two of the three mentioned one or more of these patents. One in the junk section, one in the list of six. So you're not saying the licenses are inadmissible. What you're saying is what an expert can't come in and do is offer general conclusory testimony about value without somehow linking it to the technology or the patents or the licenses or something. Is that fair? Thank you. I do think that's accurate. And thank you for picking it out of the hypothetical. Because the hypothetical is you're pushing the envelope, possibly. But this case, as the Chief explained, seems to be narrower in terms of what you're doing. Right. And that's why we're here, to discuss hypotheticals. I didn't mean to suggest otherwise. But if you go to Appendix 59, that is the district court here. This is another remarkable one of these facts. In Appendix 59, it's the district court rightly saying you have to account for the fact that these licenses were to Weiland's entire portfolio, which is what we're talking about. It's a license to the entire portfolio. Clearly, he then continues, this is a distinction that needs to be accounted for. And then he doesn't. He lets it in. So the principle is stated. It has to be accounted for. The problem is stated. But then he lets it in. And that's exactly what this court has to adjust, change. Because the principle is there, but recognized by the district court. So we have 1,000 patent portfolios. Judge Moore, as you said, they were not on balance. One of them was not discussed, not asserted. Those 1,000 patents, Your Honor, they're not meaningless. The claim is those are on CDMA, technology-wise. Let's stick with 59 for a minute. And I'm going to take you out of the specifics of the case and more generally. What you're looking to have this court do is to conclude that when an expert makes a conclusory statement, it is actually untethered to the facts he relies on. That's a basis upon which we can dauber him. It's not just methodology. But in this case, it's statements, a rule of thumb, this 75%, 25%, whatever, that is untethered to the facts. Exactly, Your Honor. Untethered. And untethered. And another clear thing from the record here is that 25%, it was not arbitrary. The untetheredness was actually explained. It's recognizing the risk of litigation. And that's at 15342. And here's how we get there. Mr. Skippen says, well, these are my crown jewels. That's why I'm asking for 75%. I don't even understand that testimony. Let me back you up for a second. His crown jewels, isn't he saying, because at one point he says these have become very, very valuable. He's meaning now. Now that they've been through litigation, they've been head valid and infringed, I don't understand that to be what everyone would have understood in 2014. In 2014, you've got three licenses, one of which puts these two patents in the junk category, the chaff category, the everything else category. You've got one license that never mentions them despite their existence, the Doro license. So what I understood in his testimony to be directed to, yeah, wait, once two patents have been found valid and infringed and a jury gives us $135 million, they are now our crown jewels. Exactly, Your Honor. And some sites, Your Honor, 15342, which is where the expert says, oh, that phrase crown jewels, I know what that means. That's used in the industry. It means that the patent has been valid and infringed. So nothing about the incremental value. And it's double counting because he actually adjusts in his analysis. He does adjust for validity and infringement. Well, Mr. Davies, Mr. Lampking would probably do better than I. But what if his, what would you respond to the argument that, fine, you've made some arguments today, the same kind of arguments that could have been readily and easily made with respect to the testimony by Skippin and Kennedy pointing out the lack of comparability, the lack of reliability, and all of this stuff. So why isn't this a question of us evaluating the, I mean, it may come out the same or it might come out different depending on which way we're looking at it. But why isn't that a matter for trial and juries and cross-examination and not as you would have it for excluding the testimony of the expert? And, Your Honor, I think that it's important we not go too far. Because it is the case that the jury has a role. And if the assessment is reasonably approximate to the value, okay. But there was no effort made. And that is something this court can't police. The expert has to try. We're not saying the try has to be 100% on. But there was no effort here. It was a simple, I have this rule at 75% because of the litigation. And I'm going to apply it. I'm not going to try. And that's why it's a dial-up issue. Because there was no effort to try. And, Your Honor, at this time, I would like to talk about claim construction and infringement. If that's okay. The district court tees up the claim construction issue. And it's at Appendix 5. And the question is whether the subscriber unit station should be construed as fixed or portable. I'm sorry. I've got to take you back. I'm just not done with the other issue. The result that you sought is that we would vacate and remand and say that Kennedy's expert opinion, as proffered, wasn't sufficiently tied to the facts. And he came up with this rule of thumb. And that's a no-no. Doesn't the result – you're not going to just have a new trial on damages. Is that right? I mean, I don't see any other possible relief. You're just going to go back for a new trial on damages? Well, I hope to convince you on claim construction, Your Honor, or infringement. But if we don't get there, then, yes, we'd have to try it again. New trial on damages. And then Kennedy is just going to hit it a third time. And now we're going to have a third theory on damages, right? I mean, I'm not going to exclude him. That's another great question for my friend, Mr. Lemkin. I'm not going to exclude him for all time. I mean, that's not what you're asking me to do. That's not what we're doing here. So you just end up with a third trial on damages. Yes, Your Honor. I think that happened in Omega as well. There's no case that says, you know, two tries and you're out. I'm asking sincerely, is there a basis for saying that the other side had several opportunities to make their case on damage? The burden is clearly on them to make their case. I don't want to make a case argument for you. You did ask for it in your briefs, but I'm just following up on what the chief was asking about. Yes, and we would accept that result. Well, yeah, I know you would. Of course, and just to follow up on that. I mean, the district court got frustrated. It gave a lot of tolerance to the experts here. You know, there's a cross appeal. And so I don't mean to detract from the effort of this court to have this district court properly treated and the litigation properly resolved. And if your experience is this is now the time to end this, we would defer to you on that. Well, I mean, I wouldn't begin to know how to end it. So I don't see how I could. I was just sort of lamenting the notion of potentially sending this back for a third trial. Can you all settle this? That's another great question for Mr. Lampkin. We'd rather we decide this because we go with him. What would the role of the determination of insufficiency of the evidence, as opposed to excluding the expert's testimony, have in determining what our judgment would be? I.e., could we say, well, the evidence was just insufficient and therefore no new trial? What would be the consequences? Yes, and the record would support that result, Your Honor. And as we have been talking, when you actually just look at the evidence, there is, you know, an expert saying. Wouldn't that always be the case? We're throwing out an expert's testimony. And yet, as I think the Chief Judge pointed out, we do that a lot. We usually send it back and don't ask. We don't say, look, your expert was inadmissible, and without that testimony, you have not sufficient evidence to go to the jury, and therefore you lose. No remand. Yes, yes. When do we do the latter and not the former? I defer to you on that, Your Honor. In other words, he has no basis for trying to tell you to give him what he wants, so he's hoping you'll come up with one. No, I think this is an extreme case. I mean, this is in a 1,000 patent portfolio. This is not— It's not that extreme a case. There's tons of other evidence. There's the CICERA, the LG, the Motorola. There's the long sums. There's a lot of damages evidence here, and you can't possibly imagine we're going to parse that in the first instance and say, ah, Apple's $10 million. I hope Apple's potential number is the right one. I mean, that's not what we do on fact questions. So if we talked about—if we could just—on claim construction, that's another way out, Your Honor. We could end the case. Okay, I'll give you 30 seconds. Go. 30 seconds on claim construction. When you look at the claim language, there is no plain meaning of subscriber unit. When you look at the specification itself, the word CPE is used over 400 times. And when you look in the present—when it's used in the present invention context, for example, at column 12, row 58 to 62, you will see that the present invention is not necessarily an embodiment. So it says the present invention, and it includes the word CPE. It does the same thing at column 19, 21 to 45, the same thing at column 20, 34 to 54. So the present invention here includes the CPE. The subscriber unit in the claim term is not instructed one way or the other. And so under this court's doctrine of consistent use, the CPE used so frequently in the present invention context suggests subscriber unit has to be CPE. And therefore, that construction should be— Okay. Thank you, Mr. Davies. We'll restore your rebuttal time. Mr. Lampkin? Thank you, Your Honor. I'll start with damages, I think, given the prior discussion. I only have one question on claim construction, so maybe we can get that out of the way and focus on areas. Should we not be troubled? I mean this case, as far as I understand, there's no prosecution history. PCE was the name of the game in the claims in the spec. And then the claims are amended to put this new term, subscriber unit. Correct me if I'm wrong, but there's no indication of why that was done, how that was done, what the consequences of that would be. So that's what's kind of troubling me about how this goes down. And now we're here, and we're fussing over the details of the language, but there's a lot at stake. And we're left to try to parse this whole thing. And didn't the patent owner have some obligation to help us out here with some clarity on PCE versus subscriber unit? Sorry. And I think I can provide that clarity. But first, the fact that there was an amendment shows that there's a difference, because otherwise the amendment would have been utterly pointless. Fair enough, but that doesn't help the court in evaluating the consequences of that amendment. Why don't I turn – let's start, then, with where the word customer premises equipment first appears in the specification in the 145. And that's column 2 on page 308. And it's talking about a proposed system, so it's not our invention. And it says that it is a two-way communication system with a plurality of base stations and a plurality of fixed subscriber stations for customer premises equipment, CPE. You go down to line 14 and it talks about fixed locations for customer premises equipment. So that's talking about fixed subscriber equipment. And that can't possibly be describing the entirety of the claim because we know that this covers portable subscriber units too. And after that, this is all describing the implementation of this invention in the context of that system with a fixed subscriber unit. It's not excluding. There's no language of express exclusion saying you can't have a mobile subscriber unit as part of the phone. In fact, exactly the opposite. When you look at the first time subscriber unit pops up, and that's in column 1, it talks about it in the context of a fixed or portable system. And it says an exemplary system is a mobile cellular telephone system. And Apple concedes at page 6 and 7 of the reply that in that system the subscriber unit is the phone. And so there's just no way of saying the subscriber unit can't be part of that. You read – I'm sorry. No, I was going to conclude. Oh, well, you read – in that context you read the word portable to include mobile. Yeah, I don't think there is a category of something that's portable – mobile but not portable. Well, it shows up in your opposing counsel's brief. Pardon? It shows up in your opposing counsel's brief. Yes, but it doesn't make sense. If it's mobile, it's also portable. And, in fact, for example, one of the cases we cite where subscriber unit is used, the opinion refers to it as a portable phone, which that's the subscriber unit. And that's just a mobile phone. And it's also in the case – if you look at the 757 patent, it's very clear that it doesn't have to be a three-box system. You don't have to have a separate piece that's called CD or something like that because it says flat out, the functionality provided in the components and modules – and here subscriber unit is defined as a module – may be combined into fewer components, and modules are further separated. And so you can combine your subscriber unit and make it part of your phone. There's no prohibition on that. That makes perfect sense. This is a spec from 2000 or so. At the time of rapid miniaturization, rapid increases in computing power. And so they're saying, look, you can put that subscriber unit where you want. You can make it an ASIC. It doesn't have to be a gigantic box like the computers of yore. Turning to damages, then. Before you get too deep into damages, a housekeeping matter. Can you turn to page 57, if you'll breathe? The relevant time for the hypothetical negotiation is 2014, correct? Correct. On page 57, under the heading case-specific tailoring, do you see where you say at the relevant time? Do you see that word? Yes. The 145 and 757 were crown jewel key patents that phone makers like Doro focused on in negotiations. That's not accurate, is it? I'm cringing as I say that because that wouldn't be Doro. That would have been something they got focused on. Okay, so it's a typo. You made a mistake. It's definitely a mistake. Doro brought it up in a later time, in the 2018 time period. In the 2018 renegotiation. Exactly, Your Honor. But the 2018 doesn't count. Well, 2018 would certainly, in some sense, be informative. You wouldn't exclude it from evidence. It would be relevant, but it wouldn't be the best evidence because it's not right at that time frame. But I think what I want to focus on is the degree to which Mr. Kennedy actually tied this royalty to the specific facts of this case. But to get into the weeds here, and I think that's where this case ends up being decided, it seems to me that the only license of the three niche licenses that talks about the 145 or the 757 at all is, with respect to the asserted patents, is the Virtu, which refers only to the 145. The others have references to asserted patents that don't include the 145 or the 757, and two of them don't even have a listing that includes those patents among the thousands. So my question to you is, how can you square Kennedy's testimony with the fact that two of these licenses don't refer to these as asserted patents and one of them only refers to one along with five others? And that's because I do not agree with the caricature that he said, if it's listed, it's 70%. That's not at all what he's doing. He's talking about this specific negotiation, and he starts out— Okay, suppose we accept that proposition, that Kennedy didn't really need to say any two. Pick them out of a thousand, and that— And I don't think that's what he meant in the jury procedure. I understand, and I can see where in the record there was some back and forth on that. But even assuming that you're right about that, how do you answer the question of why Duro and Necto in particular are relevant, or that is to say, why Kennedy's reliance on them is probative, given that they throw those two licenses into the CHAMP category? Well, Your Honor, these are licenses for the same technologies. They cover the technologies, and they are for the same type of phone. So this is all—and I don't understand Apple saying that these are not admissible. And the point of it is that when Mr. Kennedy went through this, he didn't just say, oh, I think this is Weider, this is CHAMP. He actually went through and explained why these were the key components and why people would pay for these licenses. And let me start out. It's not just the crown jewels that Chief Judge Moore pointed out. If you look at page 1520.15236 and 15237 of the record, he's discussing why these are critical to an absolutely important system, and that is VoLTE, voice over LTE. And if you don't have these patents, if you can't practice it, the voice component gets squashed. Anytime your phone decides to download an app, decides to update something, or is downloading emails, you don't have workable voice without this technology. And he's talking about this as being absolutely critical technology. And then he turns around and says, and the other ones—he's talking about the enormous value of the licensee there. He turns around and says, you know, the other things in this particular portfolio for phone makers are less valuable. So— But the one thing I'm confused about is on 115237 and 238, I mean one of the things that's clear about Kennedy's testimony is he does suggest at one point that the asserted patents in any licensing agreement are the most valuable. I think he recognizes that in general, one would think that well-informed parties would identify those that they thought are most important. But it's not always going to be that case. You might identify the ones that you think are—for which you have the most clear infringement rate. You might choose exemplary patents. So it's not always the case that you're going to do it. And he just uses that as sort of a rough cut to describe it. But what he's talking about in the rest of it is which are the most important patents? What really adds value to this portfolio? How can I decide that? So are you saying he didn't— Is it what is—I'm sorry. Go ahead. Is it what he thinks, in retrospect, added value? Or is it what the parties believe added value? Isn't it the latter? I think it is when you're looking at what parties in an arms-length negotiation you are wired at. You're going to presume the parties, and here are Apple and YLAN, are going to arrive at what is actually the truth in the universe. You're not going to assume that they're going to make a mistake and have a false recognition of what's valuable. And what's valuable here is the ability to prioritize those voice signals so they don't get squashed by background data. And he also goes through and explains why the other patents in the portfolio were of lesser value. He's very specific. He says they're close to expiring. They've been exhausted because they have Bluetooth. It's already been licensed to chip makers. And Apple could cross-examine him on that and say, no, no, no, here's one that's really valuable. You should have counted this as more than 25%. This one's worth 70%. But the only ones that come up are Bluetooth, which is expired or exhausted by license of chip makers, and that's at 15331. Wi-Fi, expired at 15331, line 19. 3G, HPSA, close to expiring at 15331. Many were implementation patents, and that's actually very important. Implementation patents aren't things you need. They might be nice to have, but you don't need them. Here to have voice over LTE to prevent yourself from having that Skype scenario where you just get your signal absolutely squashed, the voice can't be heard at all, you're going to need this technology. It's absolutely important. Otherwise, as our experts claim, you go back from 4G LTE back to 3G. You go to something like an over-the-top. That all may be true, and Kennedy may be correct that having these patents is necessary, but that doesn't seem to me to relate to the licenses themselves, given that at the time they were negotiating, it appears that nobody recognized what Kennedy now is testifying to. Well, certainly at least one did, right? We know it came up in Vertu, and we know it was the 145, not the 757. Amongst five others, I guess. Amongst five others, that's right. So how do we attribute all the value to the 145, even setting aside that the 757 wasn't? And the question is not what those people thought at that time. It's like we have a license that presumably covers the value of the portfolio, and the question is, okay, when Apple and we are sitting down for negotiation and we're looking at what is going to be the value for these two licenses on the portfolio, what are we going to arrive at? And that should depend on what's real, what genuinely matters to Apple as a very sophisticated party. So you mean objectively viewed as opposed to through the lens of the parties? I think it's from the lens of the parties, but I also think that you presume the parties ordinarily understand what economic reality is like and how important these things are. These are highly sophisticated parties, and the record shows that it was not just crown jewels, but absolutely critical to be in the 4G LTE world to have voice over LTE. Otherwise, it just isn't going to work. It also shows that the other patents were of lesser value, and so in taking all these things into account, and there's the wheat versus shaft idea and other things like that, Kennedy said based on my experience, based on my discussions with Mr. Skippin, based on these other factors, I think these were worth roughly a discount of 25% to take away all the other patents, but these were the most important. And the jury could hear all the cross-examination it wanted on that, and it could make a determination. It doesn't render any of this evidence inadmissible because it's so closely tied. And your position, from what you're saying, I take it your position is even if there had been no reference to a certain patent, and there had just been a statement, here's 1,000 patents, that Kennedy's testimony would have been admissible and the valuation would have been exactly the same. I don't know whether he'd come out exactly the same because whether it's mentioned is something that he took into account, but it certainly would be admissible because it is the exact – I'm not sure I saw any place where he took into account the fact that the 757 and the 145 were not mentioned as assertive patents in the – Right, which suggests that perhaps it would be the same or perhaps not. It is something that he actually did consider because he brought it up for Durow. He brought it up that it was in 2018 for Durow. He brought it up for Vertu. He didn't mention it for UNESCO because it wasn't mentioned. No, no, it's worse than that. He mentioned it for UNESCO, and he treats them as though they're in the assertive patent category. Let's look at 15237. Well, Vertu we already looked at. It's in the Patent License Agreement. They've got that one specifically lined out. UNECTO, who we heard about, is no longer in business, but at the same time they certainly plan on being in business, and they specifically listed both of the patents. I think one by the identifier number because it hadn't issued yet and the other by the specific patent number. Those are both listed in the UNECTO license. The UNECTO license specifically lists both patents in this case. Yes. Yes, they're specifically listed. In the junk section. No, but they're not listed in the junk section. They may be not in the junk section. Mr. Skiffin testified, Mr. Kennedy adopted it, that somewhere between zero – that all the other patents are worth somewhere between zero and 35%. These patents were listed in the section that, according to your testimony of your people, was worth between zero and 35% of the value of the portfolio. I don't understand that they were – there was a separate section that said here's the throw-in section, here's the – they're listed. Mr. Skiffin explained it. There's two patents – the asserted patents drive the value in the license and we throw in the rest of the portfolio and the rest of the portfolio, it would be valued somewhere between zero and 35%. In the UNECTO license, these are unequivocally in the rest of the portfolio section. And that's one of the reasons why this caricature of saying, oh, it was – everything was just – if it's mentioned, it's 70% and if it's not, it's 30% isn't an accurate characterization. What was going on here as you look and said, what are the most important patents that drive the value here? And that was his analysis as closely as I could. But how could the UNECTO license demonstrate that these are the most important patents that drive the value? I don't think the UNECTO patents necessarily drive that home. UNECTO license. Pardon? UNECTO license.  I don't think the UNECTO license itself would drive that home. Mr. Kennedy said it did. Mr. Kennedy said that it was listed, which makes it somewhat important, but it's not one that was discussed. But I think the most important thing in this context is what drives the value of that portfolio. And what Mr. Kennedy did is exactly what you'd expect an expert to do. He would say, these are the most important. This is why it's absolutely critical to the technology. These are less important because they're expiring, et cetera. And Apple can cross-examine that on whatever basis. This is the type of thing that juries work out. The judge did not abuse his discretion in admitting this testimony. If I could turn very, very briefly to the cross-appeal because otherwise I don't get rebuttal. Before you get there, I have a question about the cross-appeal, which is it's marked confidential, but then some of the language – I'm sorry, with respect to one of the issues in the cross-appeal, which is the term license. Yes. It's marked confidential, but there's some discussion that's not confidential in the briefing. So for purposes of helping us out in terms of what we can say about that here and what we can do about it in writing, is Section 3.2 confidential or not? Section 3.2 of? The term license. The term license, yes. The Intel license. I don't know. I'm going to have to – you know what? That's something that we definitely should agree upon. Because I think one of the main sentences in that, I think the party is discussing the briefs in a non-confidential manner. If it appears in the district court's opinion – I want to be the one to – I think that's – if I remember correctly, that's a language that appears in the district court's opinion, which is public, and so I think that's fine if it appears in the district court's opinion. That's why it appears. For the cross-appeal, will you go to that issue? Will you please go to Section 3.2 and whether it creates a perpetual license such that Intel chips manufactured or chips manufactured and used by Intel after the term of the license should have been included in the damage award? So – and the answer is it does not include it because it's actually very specifically limited. There's a for clarity clause there. And the for clarity clause says that it extends only to activities – sales, manufacturing – that were actually engaged in during the term license period. That doesn't cover those same activities when engaged in after the term license period. Remember, this is a for clarity clause. It's not supposed to dramatically expand the scope of the license. It's supposed to clarify that which is already apparent. And making that clause mean that if you make a particular chip, you can continue to make and sell it and use it even after the expiration of the license, that would make it the perpetual license. That would turn a for clarity clause into a very dramatic expansion. Are you saying the same thing with respect to use? Hmm? Are you making the same argument with respect to use? In other words, if I buy something which is licensed at the time and I'm using it, I'm the customer, and the license comes to an end, would I have to stop using it? Never mind making and selling. Yeah, so I think that the answer is on this, it would have that effect. The effect of which way? Your right to continue using it would end. But it would not extend to people downstream, right, because you understand those are going to be exhausted under a Supreme Court precedent, which is actually another reason why you would have this type of for clarity clause because at the time, we were under Malincroft. And we're just making absolutely clear that both the rights that Intel would have and the rights of people downstream, this is what controls them, and then you have a separate exhaustion issue that covers Malincroft issue. If I could turn very briefly to the other issue, and that is the new trial order rests on just simply a fundamental mistake. We agree with Apple that it rises or falls with the admissibility of Matt Assetti's testimony on the advantage of VoLTE and the advantage of VoLTE under loading in particular. And Apple just agrees with us that he didn't testify, here's the increased value of VoLTE. He testified, here's the value it brings under loading, and that's the situation where the technology, the patented technology makes a difference. What do you say about the, I'll just use this shortcut, the evidence on, the statements on page 989 in the appendix where Weiland comes back and says, well, here were the initial problems with Matt Assetti's testimony and we can trim 0.6 out of that. Are you saying that basically you were accommodating to the district court's erroneous ruling? So when the district court tells you you need to change it and you need to be more conservative, there are lots of ways to make it more conservative. But the notion that there was somehow, as Apple now says, a 0.6 baseline difference, that's not true because that point in the report they're looking at is under heavy traffic network conditions or at least moderate network conditions. So our technology is actually working there to make that difference. So any difference between the two is more than wiped out by Matt Assetti being very conservative. He was actually comparing Skype's best to our average. If you use Skype's average to our average, the difference was not 2.3, but it was a difference of more than 1.2, which wipes out the 0.6 difference that Apple is talking about. So in the end, he was so conservative that any complaint Apple might have about a baseline difference is wiped out by the conservative nature. And one further question. Kennedy testified, I think it was Kennedy, that the value to a consumer of the phone with VoLTE was $121, if I have the number right, greater than the phone with Skype. And then he took 1% of that. Now, his testimony on that was, well, I've been around the block a few times, and I think it's somewhere in the low one single digits. That has a very made-up feel to it. How do you defend that choice of 1% as opposed to a choice of 2% or one-half of a percent? Yeah, so the $121, that's from survey evidence that Apple never complains about. And I don't think Apple complains about the 99%. The argument is that because he was 99%, that showed that he failed to allocate between the value of this technology and other technology. But that was actually honed in on underloading, so it was all about this technology. The 99%... Look, he said Apple has immense bargaining power. I think they would get the lion's share of this, and it's 99%, and that works to our detriment. I don't think that Apple is going to complain... My recollection is that during the fable, the lion took it all. Yeah, well, the lion here left us 1% for the mouse. And I think that that was entirely permissible in terms of what he did. And I don't think Apple is claiming prejudice that they got 99%. They just are arguing that shows that he didn't properly do an allocation for the value of the technology versus the value of other things that are in the phone. It does have a sort of made-up feel to it, though. You know, this is the sort of thing that when you're trying to figure out, there's lots of things you're going to take into account because this is the implementer who takes a lot of risk in terms of developing the product. If it doesn't work, they have the risk. They have the marketing risk. They have lots of things to do. And I think when you walk through it, you come up with something like, they're going to get the lion's share, and especially if they're Apple. But other than doing it through qualitative functions, it's very hard to do anything. But there wasn't much testimony from Kennedy on that. He just sort of popped up with... No, there is the limited testimony. I will concede that. But I don't think Apple says, 99% was wrong, I was prejudiced. It says, yeah, 99%, that shows that you didn't do the allocation right the first time. Can I just ask one very quick question and back to the second cross-appeal issue that you discussed first on the term license. Is there anything in the record to establish what the quantity is that would be affected? In other words, how would this affect the damages amount? Is it by 20%, by 5%? You know, and this is... I don't remember the number. I do think it's in the tens of millions of dollars, but I don't know the precise figure. By rebuttal, I will have it for you because I think my colleague does know that answer. But the answer, the bottom line is, even if what both constructions are plausible, it should have gone to a jury. It should go to the trier of fact. It's not something you could have decided on solely by judgment. Thank you, Your Honor. Okay. So, Your Honor, two footnotes and then a couple... so, four points. First two are, one, we have not agreed that the 99%, that whole kind of survey of customer preferences, is just an issue that hasn't been related to resolution. At 15333, there's a quote about the value of the Bluetooth license. So, to the extent that that needs support, that's at 15333. The two other issues are claim construction and its infringement. And I understand we could just spend a few seconds on claim construction. The question of mobility and portability, we do distinguish between those two. The portable is the phone you walk around the house with at the base station or somewhere else. The cell phone, mobile, that's what we all have in our pockets today. And one way to read this patent is, if you look at subscriber radio station in Column 1-138 and treat that as a cell phone, it's clear that the rest of the patent is just talking about portable. So, that's Column 1, Line 38. A question that falls probably into the completely hypothetical category, but I am trying to grapple with this portability, mobility issue. Suppose that in the primitive years that all this technology was coming into play, you had a phone which would have an optional clip-on device that you'd clip onto your phone, which would serve as the CPE slash subscriber unit. Would you view that as being a separate device as you view this? Because it's not inside the phone, but it's not really outside the phone. That's an interesting hypothetical. You could leave it on your kitchen table, but you could also clip it onto the phone. So, my hypothetical answer is that a lot requires, here it turns on the CPE being fixed, so it can have a consistent relationship with the base station. The broader range of the device you're describing that's outside the phone, I think the harder it would be for it to work. But if you view it as portable, then it doesn't have a fixed relationship to the base station except for the period. It's more limited. The portable would be more limited. So, I do think it's worth, with your permission, just a little bit on the Sprint phone. We don't infringe the Sprint phone. If you look at the diagram on page 44, which is the one they have out briefed, it's all over their papers. The diagram with the two tubes, one of those tubes is Vault-E, and the Sprint phones don't work on Vault-E. So, how we could be infringing something that these devices cannot do, and that's real money, so I do want to spend some time on that. In terms of as I stood up, if you look at footnote 2, appendix 32, that's just where we have not conceded that the accuracy of any of these customer surveys that are in this case. So, that's what I really wanted to talk about, Your Honor. I have 52 seconds left. Intel was discussed, but it's been a long day and there's been no questions. I'm okay. Thank you, Mr. Davies. Mr. Lampkin, other than him saying Intel was discussed, he didn't really address your cross-appeal, right? All right. Okay, then this case is taken under submission. All rise.